**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAUPHIN PRECISION TOOL, LLC,** | : | **CIVIL ACTION NO. 1:06-CV-2262** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED STEEL WORKERS OF** | : | |
| **AMERICA, AFL-CIO, LOCAL UNION** | : | |
| **1688-13, DISTRICT #10,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Presently before the court is the challenge of plaintiff Dauphin Precision Tool, LLC ("Dauphin Precision") to an arbitration award in favor of defendant union United Steel Workers ("the USW"), which represents its employees. Dauphin Precision seeks to set aside the award because it is allegedly contrary to the collective bargaining agreement between the parties and because of arbitral bias in favor of the union. The USW contends that neither argument warrants vacatur of the award. The parties have filed cross-motions for summary judgment. For the reasons that follow, Dauphin Precision's motion (Doc. 16) will be denied, and the USW's motion (Doc. 20) will be granted.

I.    **Factual Background**[1]

On May 10, 2006, Dauphin Precision discharged Timothy Tschopp

("Tschopp"), an employee of nineteen years and member of the USW, for repeated

unexcused absence from work.  (Doc. 29 ¶ 8; Doc. 34 ¶ 8.)[2]  Dauphin Precision and

the USW dispute the legitimacy of this discharge under the terms of the collective

bargaining agreement ("CBA") then in effect between the parties.

A.    **The Collective Bargaining Agreement**

Dauphin Precision and USW entered the CBA controlling this dispute on

November 15, 2005.  (Doc. 1, Ex. A at 1.)  The agreement, which has a term of one

year, includes an absenteeism policy outlining progressive sanctions for employees

as they accumulate absentee hours.  (See id. & app. D.IV.)  The policy provides that

an employee will receive verbal counseling after twenty-four absentee hours and

written counseling after thirty-two hours and forty hours of absence respectively.

---

[1]In light the applicable standard of review, the court will present the facts in
the light most favorable to the non-moving party with respect to each motion.  See
infra Part II.  The court must accept all "findings of fact and inferences to be drawn
therefrom" that arise from any issue presented to the arbitrator.  See Citgo Asphalt
Refining Co. v. Paper, Allied-Indus., Chem., & Energy Int'l Union Local No. 2-991,
385 F.3d 809, 816 (3d Cir. 2004).

[2]Although the parties dispute the propriety of Tschopp's absences, they agree
that Tschopp was absent as set forth in Dauphin Precision's exhibits in support of
its motion.  (Doc. 18 ¶¶ 10-11; Doc. 19 at 47-49; Doc. 32 ¶¶ 10-11.)

(Id.)  Employees accumulating more forty absentee hours are subject to discharge.[3]

(Id.)  The policy does not define "absentee hours" but exempts military service, jury

duty, approved union activity, and absences under the Family Medical Leave Act

("FMLA").  (Id.)  In addition, the policy does not state whether vacation hours

qualify as "absentee hours" within the ambit of the progressive discipline

---

[3]The complete absentee policy encompasses two pages of the nearly ninety-page contract.  Its terms governing administration and discipline are perfunctory and provide, in full:

> ADMINISTRATION:  This policy is administered on a maximum of 5 days (40 hours) on a rolling year basis.  Absentee hours are charged against the 5 days as follows:
>> Up to 2 hours = 2 hours
>> More than 2 hours up to 4 hours = 4 hours
>> More than 4 hours up to 8 hours = 8 hours
>
> * * *
>
> DISTRIBUTION OF HOURS:
> A.   *Tardiness and/or leaving early*
>
>> Up to and including 2 hours
>> Uses 2 hours of personal time
>
>> More than 2 hours, but up to and including 4 hours
>> Uses 4 hours of personal time
>
>> More than 4 hours, but less than 8 hours
>> Uses 8 hours of personal time
>
> B.   *Absence: (full 8 hours)*
>> Uses 8 hours of personal time
>
> ATTENDANCE COUNSELING AT THESE LEVELS
> 24 Hours – Verbal Counseling
> 32 Hours – Written Counseling
> 40 Hours – 2nd Written Counseling
> 40+ Hours – Discharge

(Doc. 1, Ex. A app. D.IV.)

provisions.  A substantively identical absentee policy was in effect during the

previous contract year, which commenced November 16, 2004.  (Doc. 19 at 45-46.)[4]

The CBA contains separate provisions governing vacation, leaves of absence,

and discharge.  It authorizes employees to substitute one day of vacation pay for

one day of illness, provided that the employee informs the company on the day of

absence.  (Doc. 1, Ex. A § XVII.3.)  The contract also authorizes the company to

control allotment of employees' vacation periods to ensure that the company is able

to maintain adequate staffing for essential positions on all shifts.  (Id. § XVII.3.)  The

CBA's seniority terms provide that employees will lose their seniority and

employment upon "discharge[] for just cause."  (Doc. 1, Ex. A § XVIII.7.b.)

> **B.   Tschopp's Absences**

Beginning in the spring of 2004, Tschopp commenced an annual pattern of

expending all his vacation days within approximately three months of receiving

them.  (Doc. 19 at 47-49.)  According to Dauphin Precision's time records, Tschopp

was absent from work on twenty-two days between mid-March and mid-June of

2004.  (Doc. 1, Ex. B at 7; Doc. 19 at 47.)  Nine days were vacation taken with proper

notice (hereinafter "proper vacation days").  For ten of the twenty-two days,

Tschopp did not provide notice but had unused vacation time to cover the absences

---

[4]Docket Entry 19 is a compilation of Dauphin Precision's exhibits, some of
which are individually numbered and some of which are not.  For ease of reference,
citations to Document 19 refer to consecutively numbered pages 1 through 69
beginning with the cover page of the document and ending with the certificate of
service.

(hereinafter "improper vacation days").  For the remaining three days, he provided

no notice and lacked vacation time to cover the absences.  (hereinafter "unexcused

absences").  (Doc. 1, Ex. B at 7; Doc. 19 at 47.)  Tschopp behaved in a similar

manner in spring 2005, with twenty days of absence in March and April.  (Doc. 1,

Ex. B at 7; Doc. 19 at 48.)  Five of these were proper vacation days; fifteen were

improper vacation days.  (Doc. 1, Ex. B at 7; Doc. 19 at 48.)  The pattern continued

in spring 2006, when Tschopp was absent twenty-eight days in March, April, and

May.  (Doc. 1, Ex. B at 8; Doc. 19 at 49.)  Six absences were proper vacation days.

(Doc. 1, Ex. B at 8; Doc. 19 at 49.)  Sixteen were improper vacation days, and six

were unexcused absences.  (Doc. 1, Ex. B at 8; Doc. 19 at 49.)  Dauphin Precision

discharged Tschopp on May 10, 2006, avowedly because the six unexcused absences

translated into forty-four absentee hours under the absenteeism policy, which

prescribed termination.  (Doc. 1, Ex. B at 8; Doc. 19 at 68.)

The USW acknowledges that these absences occurred but contends that

many of them were associated with Tschopp's diagnosis of polycythemia, a

condition causing an abnormal increase in the number of red blood cells circulating

in the blood stream.[5]  (Doc. 1, Ex. B at 11).  Tschopp had applied for and received

FMLA leave for his condition in spring 2005, and he had also submitted statements

of his physicians describing his medical problems to the company during early 2006.

---

[5]See Polycythemia Vera, U.S. NAT'L LIBRARY OF MED. & THE NAT'L INST. OF
HEALTH MEDLINE PLUS, Aug. 28, 2007, available at http://www.nlm.nih.gov/
medlineplus/ency/article/000589.htm.

(Doc. 1, Ex. B at 9; Doc. 29 ¶ 10; Doc. 34, ¶ 10.)  He began the process of reapplying

for FMLA leave during the spring of that year, and he had planned to submit the

requisite paperwork after a May 25, 2006 appointment with his treating physician.

(Id. at 11-12.)  His May 10, 2006 discharge preempted those plans.

### C.   The Dispute and Arbitration Proceeding

The USW instituted a grievance on behalf of Tschopp, claiming that Dauphin

Precision discharged him in violation of the CBA.  (Doc. 29 ¶ 12; Doc. 32 ¶ 12.)

Internal conciliation attempts under the CBA's grievance procedures proved

unsuccessful, and the parties submitted the grievance to arbitrator Patrick

McFadden ("Arbitrator McFadden" or "McFadden") on October 24, 2006.  (Doc. 19

at 36.)  William Coyle, Jr. ("Coyle"), the president of Dauphin Precision, represented

the company at the hearing.  (Doc. 1, Ex. B at 1.)  The USW was represented by its

subdistrict director assigned to the geographic area where Dauphin Precision is

located.  (Id.; see also Doc. 21, Ex. B ¶ 1.)

The parties' accounts of the arbitration hearing vary significantly.[6]

According to Arbitrator McFadden and the USW, Coyle was unfamiliar with

arbitration procedure and challenged McFadden's authority.  (Doc. 21, Ex. B ¶ 6.)

Coyle initially protested procedural rules, which dictate that the company present

its case first in termination disputes.  (Doc. 21, Ex. B ¶ 6.)  Coyle also refused to

enter the CBA or grievance documents as joint exhibits.  (Doc. 19 at 17; Doc. 21, Ex.

---

[6]The arbitration hearing was not recorded, and the arbitrator destroyed his
notes after rendering the decision, as was his custom.  (Doc. 19 at 11.)

B ¶ 6.)  Arbitrator McFadden described Coyle's conduct at the beginning of the hearing as "extremely aggressive" to an extent that impaired McFadden's "ability to control [the] proceeding."  (Doc. 19 at 20-21.)  The union representative recalls Coyle telling Arbitrator McFadden:  "You're not telling me what to do."  (Doc. 21, Ex. B ¶ 6.)  As the arbitration progressed, McFadden explained procedural and evidentiary rules to Coyle on several occasions,[7] and Coyle was behaving cordially by the end of the proceeding.  (Doc. 19 at 17-26; Doc. 21, Ex. B at ¶ 7.)

Dauphin Precision acknowledges that Coyle received procedural assistance from Arbitrator McFadden but denies that he engaged in an aggressive manner. (Doc. 33-2 ¶¶ 14, 16, 18.)  It also denies that Coyle told Arbitrator McFadden that the McFadden lacked authority over him.  (Id. ¶ 12.)  To the contrary, Coyle recalls McFadden startling him early in the proceedings by stating:  "Now I know what kind of employer you are."  (Id. ¶ 5.)  Coyle asked McFadden to recuse himself after making this statement, a request that the union opposed and Arbitrator McFadden denied.  (Id. ¶¶ 8-10.)  Dauphin Precision contends that this statement demonstrates that Arbitrator McFadden was biased in favor of the USW.  (Id. ¶ 8.)  Neither Dauphin Precision nor Coyle explain what prompted McFadden's statement other than alleged bias in favor of the USW.

---

[7]Arbitrator McFadden testified that he assisted Coyle to such an extent that he was concerned he may have appeared biased in favor of Dauphin Precision. (Doc. 19 at 23.)

Arbitrator McFadden recalled making a statement substantially similar to that alleged by Dauphin Precision, but he explained that it was an intentional response to Coyle's disruptive conduct and a measured attempt to regain control of the proceeding. (Doc. 19 at 24-25.) McFadden testified that his strategy proved successful and that, thereafter, he was able to direct the remainder of the arbitration. (Doc. 19 at 25, Doc. 21, Ex. B ¶ 7.)

### D.    The Arbitrator's Decision

Arbitrator McFadden issued his decision on October 27, 2006. He interpreted the just-cause provision of the CBA in conjunction with the absenteeism policy and concluded that any termination—under the absenteeism policy or otherwise— required just cause. (Doc. 1, Ex. B at 10, 13.) Hence, when Dauphin Precision discharged Tschopp, it was required to comply with both the absenteeism policy and the CBA's just-cause requirement.

McFadden examined Tschopp's attendance records and determined that he had exceeded his allotted absenteeism hours during 2004, 2005, and 2006, rendering him amenable to discharge during each successive year. (Id. at 11-13.) Further, the arbitrator determined that Dauphin Precision was aware of Tschopp's health problems during his 2006 absences. (Id. at 12.) Thus, McFadden concluded that the company discharged Tschopp despite waiving its termination rights during the two preceding years and despite having knowledge that he was suffering from a long-term illness. (Id. at 12-13.)

Arbitrator McFadden concluded that discharge under these circumstances violated the CBA's just-cause requirement because Dauphin Precision's failure to discharge Tschopp in 2004 and 2005 created an expectation that it would not require strict adherence to its absenteeism policy:

> If the company didn't miss [Tschopp] in 2004 or 2005 for [abuse of the absenteeism policy,] he had no reason to expect or believe he would be subject to dismissal [in 2006] for similar action and conduct.  In the event a company has control regarding a policy or standard and fails to enforce it uniformly over the course of time, It [sic] may not than [sic] one day decide to arbitrarily and unilaterally begin to now apply and enforce such standards with out [sic] first providing appropriate notice and warning to all employees affected of their [sic] intent.

> Here we must find for the reasons indicated above, the discipline imposed by the company upon [Tschopp] was therefore without just cause.

(Id. at 12-13.)  Under the sanctions of the absenteeism policy, which progress directly from written warnings to discharge without intermediate suspension, Arbitrator McFadden  found that he was limited to either upholding Tschopp's dismissal or ordering his complete reinstatement.  (Doc. 1, Ex. B at 12.)  McFadden ordered the company to reinstate Tschopp with back pay and benefits.  He also required Tschopp to participate in counseling to better understand his attendance obligations.  (Id. at 15.)

Dauphin Precision filed the instant suit on November 21, 2006 to vacate Arbitrator McFadden's award on the grounds that it fails to draw its essence from the terms of the CBA and that Arbitrator McFadden demonstrated was biased in favor of the USW.  Both parties have filed motions for summary judgment.  These issues have been fully briefed, and the motions are ripe for disposition.

II.   <u>**Standard of Review**</u>

Through summary judgment the court may dispose of those claims that do not present a "genuine issue as to any material fact," and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  It places the burden on the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed. <u>Pappas</u>, 331 F. Supp. 2d at 315.

The court is permitted to resolve cross-motions for summary judgment concurrently.  <u>Cf.</u> <u>Assicurazioni Generali, S.P.A. v. Pub. Serv. Mut. Ins. Co.</u>, 77 F.3d 731, 733 & n. 2 (3d Cir. 1996) (observing that district court may dispose of case through cross-motions for summary judgment); <u>see also</u> 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; <u>United States v. Hall</u>, 730 F. Supp. 646, 648 (M.D. Pa.1990).

III.   **Discussion**

Dauphin Precision's motion for summary judgment challenges Arbitrator McFadden's award on the grounds that he disregarded the terms of the CBA and that he exhibited bias in favor of the USW.  The USW's motion for summary judgment responds that neither argument is sufficient to vacate the award and requests entry of judgment in its favor.  The court will address these issues *seriatim*.

A.   **Disregard for the Terms of the CBA**

"'Full-blown judicial review of a labor arbitrator's decision[ is inappropriate because it] would annul the bargain of the parties for an arbitrator's construction of their [CBA]' and replace it with the court's constructions.  Citgo Asphalt Refining Co. V. Paper, Allied-Indus., Chem., & Energy Int'l Union Local No. 2-991, 385 F.3d 809, 815 (3d Cir. 2004) (quoting Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters, 969 F.2d 1435, 1441 (3d Cir. 1992)).  A court will vacate an arbitration award only if the arbitrator's decision "is entirely unsupported by the record or if it reflects a manifest disregard of the agreement."  Id. at 16 (quoting Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1291 (3d Cir. 1996)).  "An arbitrator's decision need be neither wise nor internally consistent."  Id.

A court must enforce a labor arbitrator's interpretation of a CBA if the arbitrator's decision "draws its essence from the collective bargaining agreement." United Indus. Workers v. Gov't of the V.I., 987 F.2d 162, 170 (3d Cir. 1993).  "A labor arbitration decision fails to draw its essence from the collective bargaining agreement if the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's

determination." Id.  An arbitral award derived from the agreement "in any rational way" will be upheld.  High Concrete Structures, Inc. v. United Elec., Radio & Mach. Workers of Am., Local 166, 879 F.2d 1215, 1219 (3d Cir. 1989).  An arbitrator's resolution of ambiguous contractual language receives similar deference.  See Exxon Shipping, 73 F.3d at 1296; United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 381 (3d Cir. 1995) (illustrating that a court should uphold an arbitrator's interpretation of a CBA if the arbitrator rendered a legitimate reading of the contractual provisions).  Courts reviewing  arbitrators' awards must adopt the arbitrator's findings of fact and inferences drawn from them.  Citgo Asphalt, 385 F.3d at 815; Air Prods. & Chems., Inc. v. Teamsters Local 773, No. Civ. A. 06-1272, 2006 WL 2136137, at *1 n.1 (E.D. Pa. July 28, 2006).

In the case *sub judice*, the arbitrator found that Tschopp had a very similar pattern of absenteeism in 2004, 2005, and 2006 but was not singled out for discharge until 2006.  (Doc. 1, Ex. B at 12.)  Thus, the arbitrator determined that Dauphin Precision breached the CBA's just-cause requirement when it discharged Tschopp in 2006 after neglecting to do so in 2004 and 2005.  A necessary corollary to this determination is the arbitrator's implicit conclusion that Tschopp's excessive absenteeism exposed him to discharge in both 2004 and 2005 in accordance with the

applicable absenteeism policy.[8]  In 2004, Tschopp accumulated three unexcused absences and ten improper vacation days.  His unexcused absences alone were insufficient to warrant discharge; the absenteeism policy authorized discharge only when employees accumulated more than forty absentee hours, or five days. Arbitrator McFadden reached a similar conclusion for Tschopp's 2005 absences, fifteen days of which were improper vacation days and none of which were unexcused absences.  Nevertheless, McFadden concluded that improper vacation days constitute "absentee hours" under the policy.  On this issue, Dauphin Precision asserts that Arbitrator McFadden's award fails to draw its essence from the CBA because the absenteeism policy considers only unexcused absences—not improper vacation days—when calculating absentee hours.

---

[8]The parties have not provided the court with a copy of the absenteeism policy in effect during 2004, which apparently functioned based upon points rather than absentee hours.  Employees received one point for every eight hours of absence.  (See Doc. 19 at 54.)  Employees received verbal counseling after accumulating one point, or eight hours of absence.  (Id.)  Written counseling followed after two and three points, or sixteen and twenty-four hours of absence, respectively.  (Id.)  Employees were discharged after accumulating four points, or thirty-two hours of absence.  (Id.)  It is unclear whether employees earned points for improper vacations days.  The 2004 policy appears to have been more stringent than the policies of subsequent years, which require forty hours of absence for a discharge sanction.  Hence, Arbitrator McFadden's opinion, which evaluated Tschopp's 2004 absences under the less severe 2005 and 2006 policies, provided Dauphin Precision with a legal interpretation more generous than that to which it was entitled.  Moreover, Dauphin Precision's attendance records indicate that Tschopp earned at least 7.25 points, or fifty-eight hours of absence, for the period from January 1 through September 30, 2004.  Dauphin Precision did not discharge him despite the accumulation nearly twice the number of points subjecting an employee to termination.  (See id. at 56-60.)  This evidence further corroborates the reasonableness of the arbitrator's conclusion that Dauphin Precision lulled Tschopp into the belief that the company would not strictly enforce its absenteeism policies.

The absenteeism policy contains no definition of "absentee hours," nor does it address its application to vacation days.  (Doc. 1, Ex. A app. D.IV.)  Confronted with a contractual ambiguity regarding the scope of the undefined term "absentee hours," the arbitrator concluded that an employee accrues absentee hours under the policy for both unexcused absences and improper vacation days.  The court must therefore determine whether the arbitrator's resolution of this ambiguity is derived from the agreement "in any rational way."  High Concrete Structures, 879 F.2d at 1219.

The CBA states that Dauphin Precision and the USW implemented the absenteeism policy "[t]o establish a . . . means to control absenteeism[] which is equitable to both the employee [sic]."  (Doc. 1, Ex. A app. D.IV)  Its purpose is to minimize the number of "employees who continually absent themselves from work."  (Id.)  Coyle further explained the policy's significance in a letter sent to Arbitrator McFadden prior to the arbitration hearing:

> It is impossible to plan, schedule, or operated [sic] efficiently if we do not have *proper, prior warning of absences and vacations.*  We acknowledge that there will be times when people have genuine emergencies and unforeseen circumstances.  These occasions are unusual and in the minority.  In the normal course, *businesses need notice to plan effectively for coverage when employees are on vacation or using vacation time.*  We have an obligation to provide vacation time and time-off consistent with our policy and union contract.  Employees have a similar and related obligation to provide proper notice when taking days off.  Failure to provide such notice is in violation of the union contract, [sic] it is inconsistent with efficient operations and is ultimately unfair to the company and to fellow workers.

(Doc. 19 at 43 (emphasis added)).  Coyle's letter indicates that Dauphin Precision's primary reason for instituting the absenteeism policy was to secure advance notice

of employee absences in order to make appropriate staffing arrangements.  From the company's perspective, any employee absence taken without proper notice presents identical staffing problems.  Viewed in this light, there is no material difference between an improper vacation day or an unexcused absence.  The company's stated purpose for the absenteeism policy therefore supports the arbitrator's resolution of the term "absentee hours."[9]  For these reasons, the court finds that the conclusion that the term "absentee hours" encompasses improper vacation days is rational and derives squarely from the agreement.

Arbitrator McFadden's interpretation of the policy rendered Tschopp eligible for termination in 2004 and 2005.  Dauphin Precision's failure to terminate Tschopp created the expectation that it would refrain from strict enforcement of the policy's discharge provisions.  Tschopp's subsequent discharge without notice violated the CBA's just-cause requirement.  The court finds that this conclusion represents a rational implementation of the CBA based on the arbitrator's construction of the absenteeism policy.  The arbitrator's interpretation therefore draws its essence from the CBA.  Dauphin Precision's motion to vacate the arbitral award on the grounds that it is contrary thereto will be denied.[10]

---

[9]Black's Law Dictionary defines absence as "[a] failure to appear when expected."  BLACK'S LAW DICTIONARY 7 (8th ed. 2004.)  This definition also supports the arbitrator's conclusion that both improper vacation days and unexcused absences fall within the ambit of the absenteeism policy because both forms of absence arise from an employee's failure to report to work as expected.

[10]Citing Tschopp's attendance record, Dauphin Precision argues that it discharged Tschopp at its first opportunity.  These attendance records reflect that Tschopp accumulated absentee hours only for unexcused absences.  (See Doc. 17 at 12-13; Doc. 19 at 50-68.)  This evidence, however, has no effect on the arbitrator's determination that Dauphin Precision was contractually *authorized* to assign

**B.**   **Bias of the Arbitrator**

A court may vacate an arbitrator's award if the arbitrator demonstrates

evident partiality in favor of one of the parties.  See Tenet Healthsystem MCP, LLC

v. Pa. Nurses Ass'n Local 712, No. Civ. A. 01-2201, 2002 WL 4637, at *3 (E.D. Pa.

Dec. 20, 2001); see also United Indus. Workers, 987 F.2d at 171-72 (holding that

arbitrator's "gratuitous remarks" regarding merits of a party's claim before hearing

all evidence were failed to establish bias sufficient to vacate award); United

Steelworkers of Am., AFL-CIO-CLC v. Hempt Bros., 866 F. Supp. 164, 167 (M.D. Pa.

1994).  Evident partiality exists if "a reasonable person would have to conclude that

the arbitrator was partial to [one] party."  See HSM Const. Servs., Inc. v. MDS Sys.,

Inc., 239 F. App'x 748, 752-53 (3d Cir. 2007) (quoting Kaplan v. First Options of Chi.,

Inc., 19 F.3d 1503, 1523 n.30 (3d. Cir. 1994)); see also In re Prudential Ins. Co. of Am.

Sales Practice Litig., 47 F. App'x 78, 79 n.3 (3d Cir. 2002).  "The showing necessary

to prove 'evident partiality' is not easily made; the circumstances surrounding the

---

absentee hours for both improper vacation days and unexcused absences.   Its
waiver of the right to assign points for improper vacation days has no effect on the
existence of that right under the terms of the policy as interpreted by the arbitrator.
See, e.g., GK MGT Inc. v. Hotel Employees & Rest. Employees Union, AFL-CIO,
930 F.2d 301, 304-05 (3d Cir. 1991) (observing that principles of waiver and estoppel
apply to collective bargaining agreements).
    Dauphin Precision further contends that it discharged Tschopp at its first
opportunity because his pre-2006 absences qualified as FMLA leave and were
therefore exempt from the policy.  Hence, he was able to rely on his FMLA status to
exclude absences from the policy after exhausting his vacation time.  In 2006 he
failed to renew his FMLA status, leaving him with no alternative means of exclusion
and causing him to accumulate unexcused absences.  Assuming that the
absenteeism policy applies only to such absences, Dauphin Precision argues that
Tschopp was first subject to discharge in 2006.  This argument is moot in light of
the arbitrator's finding that both improper vacation days and unexcused absences
constitute absentee hours under the policy.

case must be strongly suggestive of bias." See Yorkaire, Inc. v. Sheet Metal

Workers Int'l Ass'n, Local Union No. 19, 758 F. Supp. 248, 256 (E.D. Pa. 1990),

abrogation recognized on other grounds, Luden's, Inc. v. Local Union No. 6 of

Bakery, Confectionery, and Tobacco Workers Int'l Union of Am., 805 F. Supp. 313,

324 n.17 (E.D. Pa. 1992), vacated, 28 F.3d 347 (3d Cir. 1994).  Mere hostility between

the arbitrator and the parties' attorneys or representatives is insufficient to satisfy

this standard.  See Edward Mellon Trust v. UBS Painewebber, Inc., No. 2:06-CV-

0184, 2006 WL 3227826, at *9 (W.D. Pa. Nov. 6, 2006) (quoting LLT Int'l, Inc. v. MCI

Telecomms. Corp., 18 F. Supp. 2d 349, 354 (S.D.N.Y. 1998)) ("[A]crimony or negative

feelings between the arbitrators and a party's attorneys do not indicate an

appearance of bias, much less the evident partiality required to vacate an award.").

In the present case, the lone scintilla of evidence upon which Dauphin

Precision alleges arbitral bias is Arbitrator McFadden's isolated remark that "Now I

know what kind of employer you are."  McFadden's comment did not reference the

merits of either party's case or indicate that he had an interest in the proceeding.

He expressed no opinion on the outcome of the case prior to issuing his decision.

The impromptu comment primarily indicates that tension existed between

McFadden and Coyle.  This hostility alone does not constitute prejudice, and the

reasonable person reviewing Arbitrator McFadden's words would not "have to

conclude that [he] was partial to [one] party" as a result of his statement.  HSM

Const. Servs., 239 F. App'x at 752-53.

Dauphin Precision's failure to explain the context of the comment reinforces

this conclusion.  A1rbitrator McFadden's use of the words *"Now I know"* indicates

that he uttered the comment in response to an event that occurred during the hearing, yet Dauphin Precision fails to identify this stimulus.  It has also omitted any description of the discussion that preceded or followed the comment.  Dauphin Precision's reliance on Arbitrator McFadden's single naked comment would leave the reasonable person wondering about the context that precipitated it.  Without a greater awareness of this context, the reasonable person would be unable to conclude that Arbitrator McFadden's comment depicts bias in favor of the USW.

In contrast, the USW has produced sufficient evidence for a reasonable person to conclude that Arbitrator McFadden demonstrated no bias toward either party.  The union's evidence portrays an arbitration proceeding that Coyle attempted to commandeer.  McFadden made the unartful comment to regain control of the proceeding.  The reasonable person could conclude that Arbitrator McFadden used the comment as a mechanism simply to get Coyle's attention and to exert greater authority over the proceeding.  Obviously, that it was an isolated remark uttered in the midst of a heated exchange undercuts Dauphin Precision's claim of bias.  In light of this contextual evidence, the reasonable person could conclude that Arbitrator McFadden was not biased in favor of the USW.

Dauphin Precision has not sustained its burden to oppose the USW's motion for summary with evidence that necessitates a finding by the reasonable person that Arbitrator McFadden was biased.  The USW, however, has adequately responded to Dauphin Precision's motion by demonstrating that reasonable people could differ regarding his alleged prejudice.  Accordingly, entry of summary

judgment in favor of the USW is appropriate.  Dauphin Precision's motion for

summary judgment will be denied.[11]

## IV.  __Conclusion__

Arbitrator McFadden's interpretation of the absenteeism policy rationally

resolved an ambiguity in contractual language and therefore derives from the

essence of the CBA.  The evidence of record is insufficient to demonstrate that he

engaged in clear arbitral bias.  Dauphin Precision's motion for summary judgment

---

[11]As further support for its claims of bias, Dauphin Precision cites a pending
case that also challenges an award of Arbitrator McFadden.  See (Doc. 41); Bemis
Co. v. Graphic Commc'n Union Local No. 735-S, No. 3:07-CV-1307 (M.D. Pa.)
(Munley, J.).  Bemis involves an employer's discharge of an employee based upon
excessive absenteeism.  After numerous absences the employee and employer
executed a written agreement stating that the employee would be immediately
discharged for failure to attend work except for certain enumerated reasons,
including "hospitalization."  (Doc. 39-3 at 47-49.)  The employee subsequently
suffered an injury unrelated to his employment and received treatment at an
outpatient medical facility.  (Id.)  The treatment caused him to miss a day of work,
and the employer terminated him as a result.  (Id. at 50.)  The CBA in effect
between the parties contained a just cause requirement for termination.  (Id. at 15.)
The employer and union argued the ensuing grievance before Arbitrator
McFadden.  In rendering his decision, McFadden contacted the medical facility
where the employee received treatment and discovered that the facility provided
diagnostic services similar to those performed at a hospital.  (Id. at 53.)  The
arbitrator found that the contractual term *hospitalization* was ambiguous because it
could refer to either inpatient or outpatient treatment of the sort administered by a
hospital.  (Id.)  Arbitrator McFadden concluded that the term included both forms
of treatment and found that the employee's discharge violated the just-cause
provision of the CBA because the employee had received outpatient treatment
similar to that provided by a hospital.  (Id.)  Bemis' value is limited because it is
factually dissimilar.  It confirms little more than the mutual opprobrium with which
Dauphin Precision and Bemis perceive Arbitrator McFadden's awards.  The mere
fact that excessive absenteeism was at issue in two disparate arbitration
proceedings would not require reasonable people to find evident partiality on the
part of McFadden.

(Doc. 16) will be denied.  The motion for summary judgment of the USW (Doc. 20)

will be granted, and the award of the arbitrator will be enforced.[12]

An appropriate order will issue.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:        March 26, 2008

---

[12]The USW's brief in support of its motion for summary judgment requests an award of attorneys' fees and costs associated with defending the instant matter. Its motion does not formally request recovery of these charges, nor has it provided the court with itemized statements of the costs incurred in defending Dauphin Precision's suit.  The court therefore declines to rule on the fee request at this time and will grant the USW an opportunity to file a motion for a fee award itemizing the various charges it seeks to recover.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DAUPHIN PRECISION TOOL, LLC,** | **:** | **CIVIL ACTION NO. 1:06-CV-2262** |
| | **:** | |
| **Plaintiff** | **:** | **(Judge Conner)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **UNITED STEEL WORKERS OF** | **:** | |
| **AMERICA, AFL-CIO, LOCAL UNION** | **:** | |
| **1688-13, DISTRICT #10,** | **:** | |
| | **:** | |
| **Defendant** | **:** | |

## <u>ORDER</u>

_____AND NOW, this 26th day of March, 2008, upon consideration of the motions

for summary judgment (Docs. 16, 20), and for the reasons set forth in the

accompanying memorandum, it is hereby ordered that:

1.   The motion for summary judgment (Doc. 16) of Dauphin Precision Tool, LLC is DENIED.

2.   The motion for summary judgment (Doc. 20) of United Steel Workers is GRANTED.

3.   Defendant United Steel Workers shall be permitted to file, on or before April 16, 2008, a motion for attorneys' fees, costs, and expenses accompanied by a brief in support thereof.  Attorneys' fees shall be enumerated by date and task performed and accompanied by the number of billable hours and rate applied to each task.  All other costs shall be itemized according to the event for which they were incurred.

4.   Plaintiff Dauphin Precision Tool, LLC shall be permitted to file, on or before May 2, 2008, a brief in opposition to any such motion.

5.   Defendant United Steel Workers shall be permitted to file, on or before May 13, 2008, a brief in reply.

6.      The Clerk of Court is directed to defer entry of judgment pending
        disposition of any motion filed in accordance with Paragraphs 3-5,
        <u>supra</u>.  In the event that no such motion follows, the court will direct
        entry of judgment at a later date.


                                    <u>  S/ Christopher C. Conner  </u>
                                    CHRISTOPHER C. CONNER
                                    United States District Judge